UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 11-50073-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| FRANCISCO LOPEZ, | ) | |
| aka FRANCISCA LOPEZ, | ) | |
| PONCHO LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Defendant Francisco Lopez is before the court on an indictment charging him with the willful and unlawful failure to pay legal child support for J.R.L, who was previously a minor child, but who has now attained the age of 18.  See Docket No. 1.  Mr. Lopez is alleged by the government to have adopted J.R.L. in tribal court proceedings and to have thereby assumed the legal obligation to support J.R.L.  Alleging that those tribal proceedings were void, Mr. Lopez moves to dismiss the indictment against him.  See Docket No. 28.  The government opposes the motion.  The district court, the Honorable Jeffrey L. Viken, referred Mr. Lopez's motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

**FACTS**

The following facts are asserted by Mr. Lopez. The government's dispute of the asserted facts is noted where appropriate. Francisco Lopez is a resident alien from Mexico. In December, 1993, he was living with his girlfriend, Francine Joyce Guevara, in Rapid City, South Dakota. The couple has never been married.

On December 23, 1993, Francine's sister, Carla T. Kocer, gave birth to a baby boy, J.R.L. Because Kocer had had other children taken away from her by the Department of Social Services, she asked Francine to adopt J.R.L. so that the baby would not be taken by the state.

Francine asked Mr. Lopez to sign an adoption petition. She allegedly told him that he would not be responsible for the child, financially or in any other way. Francine told Mr. Lopez that she would raise the boy. Lopez agreed to sign the adoption petition. Mr. Lopez asserts that he could not read English and did not have any real understanding of the petition other than what Francine told him.

On December 29, 1993, Francine and Mr. Lopez traveled to the Pine Ridge Indian Reservation, the home of the Oglala Sioux Tribe (hereinafter "OST"). Neither Mr. Lopez nor J.R.L. were tribal members at the time. They appeared in Oglala Sioux Tribal Court for an adoption hearing. No representative of the state department of social services nor the tribal equivalent nor the tribal court met with Mr. Lopez or Francine to inquire about

2

their status or the details of J.R.L.'s family situation. At no time did Mr. Lopez sign any written consent to be bound by Tribal jurisdiction. The tribal court's jurisdiction over Mr. Lopez was not discussed or made a part of the adoption petition or court order. No record exists that anyone consented to the court's jurisdiction over J.R.L., who was also a non-tribal-member.

During the hearing, the Tribal Court inquired whether the couple wished to adopt J.R.L. and whether they had both signed the petition. The Court also confirmed that the biological mother had terminated her parental rights prior to the hearing. Although the petition represented that Ms. Kocer had so terminated her rights, there were in fact no legal proceedings that accomplished that end. Tribal Court records erroneously indicate that Francine and Mr. Lopez were married at the time of the adoption, though whether that was an error on the court's part, or subterfuge on the part of Francine and Mr. Lopez, is unknown.

Mr. Lopez asserts that David Martin was J.R.L.'s biological father and that Mr. Martin never terminated his parental rights. The government denies that David Martin is J.R.L.'s biological father and asserts that J.R.L.'s paternity is unknown. In any case, both parties agree that the Tribal Court made no finding with respect to who J.R.L.'s biological father is nor did it terminate the father's parental rights.

The Tribal Court approved the adoption. Afterward, Francine took J.R.L. home with her to Rapid City. Francine and Mr. Lopez remained in a cohabiting relationship for one to two more years, after which they ended their relationship. Mr. Lopez assumed that Francine had legal custody of J.R.L. No divorce proceedings accompanied the separation of Mr. Lopez and Francine.

After the couple split up, the South Dakota Department of Social Services contacted Mr. Lopez to notify him that support proceedings had been initiated against him concerning J.R.L. In 1994, Mr. Lopez signed a stipulation acknowledging his child support obligation for J.R.L. See Docket No. 34-1.

The stipulation is riddled with factual errors. It states that Mr. Lopez owed $75.00 child support per month–without ever explaining when and how that figure was arrived at. Id. As stated above, there were no divorce or custody proceedings after Mr. Lopez and Francine separated. It is never explained in this record how that $75.00 per month figure was arrived at, by whom, or when.

The stipulation also asserts that Mr. Lopez owed $945 in past due support covering the period from April 16, 1991, to July 22, 1994. Id. J.R.L., as recited above, was born December 23, 1993, not two years earlier in April, 1991. Mr. Lopez could not have incurred a child support obligation for J.R.L. prior to December 23, 1993, because J.R.L. had not yet been born. Furthermore, if one multiplies the sum of $75.00 per month for the time period

specified–April 16, 1991, to July 22, 1994 (39 months)–one arrives at the figure of $2,925.00 in past due support that should have been owing, not the $945.00 recited in the stipulation.  Id.  The error in J.R.L.'s birth date and the apparent error in calculating Mr. Lopez's past due support is never explained to this court in this record.  The stipulation was filed in South Dakota state circuit court.

Approximately four years later, a state circuit court judge issued a judgment for support debt and an order amending Mr. Lopez's child support obligation.  See Docket No. 34-2.  The state court judgment is dated February 1, 1998.  Id.  That document recites the amount of past due support owed by Mr. Lopez to be $2,534.00–which is, of course, neither the amount from the stipulation nor the amount arrived at by multiplying the number of months of past due support owed by the monthly payment of $75.00.  The judgment does correctly recite J.R.L.'s December 23, 1993, birth date.  Id.  The judgment also more than quadrupled Mr. Lopez's monthly child support payment from the previous figure of $75.00 per month to a new total of $362.00 per month.  Id.

At the time the state court judgment was issued, Mr. Lopez was listed as living in Tennessee.  Id.  His telephone number and employer were listed as "unknown."  Id.  The state court support judgment was not served on Mr. Lopez until 12 years later, on June 6, 2010.  See Docket No. 34-3.  After being served, Mr. Lopez did not file any objection in state court nor did he

attempt to appeal from the judgment. The current federal indictment charging Mr. Lopez with the felony crime of failure to pay child support was issued on July 6, 2011.

## DISCUSSION

Several issues are presented by Mr. Lopez's motion: (1) is this issue a legal issue for the court to decide prior to trial, or should Mr. Lopez take up this argument when making his motion for judgment of acquittal at the close of the government's case in chief at trial; (2) did the tribal court lack personal jurisdiction over Mr. Lopez, making its adoption order void; and (3) if so, does the intervening state court judgment create a barrier to any collateral attack on the tribal court proceedings.

**A.     Whether Mr. Lopez's Motion Should be Decided Now, Pre-Trial**

Both Mr. Lopez and the government agree that the issue presented by Mr. Lopez's motion to dismiss is a question of law that the court should resolve prior to trial. See Docket 46, page 8; Docket 47, page 5. Specifically, the question does not involved the bald question whether Mr. Lopez is J.R.L.'s father or whether the amount owed under the state court support order is at least $10,000. Rather, it concerns the procedural and jurisdictional validity of the support order in question. Accordingly, the court will reach the merits of the issued on Mr. Lopez's motion to dismiss.

## B.     Whether the Tribal Court's Adoption Order is Void

Both parties agree that collateral attacks on a state court support order are not allowed as to factual matters, such as whether the defendant is the father (biological or adoptive) of the child for whom the support is owed or whether there is a sufficient amount of past due support owed to satisfy the requirements of the statute.  See United States v. Berner, 587 F. Supp. 2d 1105, 1109 (D.S.D. 2008) (citing United States v. Kerley, 416 F.3d 176 (2d Cir. 2005); United States v. Bigford, 365 F.3d 859 (10th Cir. 2004); United States v. Molak, 276 F.3d 45 (1st Cir. 2002); United States v. Faasse, 265 F.3d 475 (6th Cir. 2001) (**en banc**); United States v. Kramer, 225 F.3d 847 (7th Cir. 2000); United States v. Brand, 163 F.3d 1268 (11th Cir. 1998); United States v. Bailey, 115 F.3d 1222 (5th Cir. 1997); United States v. Johnson, 114 F.3d 476 (4th Cir. 1997)).

However, Mr. Lopez asserts that a collateral attack on the underlying order is permitted in order to show that the court that issued the support order was without personal jurisdiction over Mr. Lopez.  See Bigford, 365 F.3d at 870-72; Kramer, 225 F.3d at 857-58 (both allowing collateral attack of the underlying state support order to show that the state court lacked personal jurisdiction over the defendant).  But see Kerley, 416 F.3d at 182-84 (refusing to allow collateral attack on underlying state court support order where the defendant argued that the state court had lacked subject matter–as opposed to

7

personal–jurisdiction). Here, Mr. Lopez asserts that the tribal court lacked personal jurisdiction over him.

The government never addresses in either of its two briefs whether the tribal court indeed had jurisdiction over Mr. Lopez. The government instead relies on its argument that no collateral attack on the tribal court order may be had in this federal prosecution because the intervening state court support order was valid.

Whether a tribal court has adjudicative power over a non-tribal-member is a federal question. Plains Commerce Bank v. Long Family Land and Cattle Co., 554 U.S. 316, 324 (2008) (citing Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 15 (1987); and National Farmers Union Ins. Co. v. Crow Tribe, 471 U.S. 845, 852-53 (1985)). If a tribal court is found to have lacked jurisdiction over the nonmember, any judgment purportedly issued against that nonmember is "necessarily null and void." Plains Commerce Bank, 554 U.S. at 324.

The general rule is that Indian tribes do not possess civil authority over non-tribal-members. Id. at 328-29. However, there are two exceptions to this principle. Id. First, Indian tribes may exercise civil jurisdiction over non-Indians on their reservations if the nonmember enters into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. Id. at 329 (citing Montana v. United States, 450 U.S. 544, 565 (1981)). Second, an Indian tribe may exercise civil

jurisdiction over a non-member if the non-member's conduct threatens or has a "direct effect on the political integrity, the economic security, or the health and welfare of the tribe." Id. at 329-30. Any attempt by an Indian tribe to exercise jurisdiction over a non-member is presumptively invalid and the burden is on the Tribe to establish the existence of one of the Montana exceptions. Id. at 330.

Although the question of whether a tribal court has personal jurisdiction over a non-member is a federal question, concerns of comity require that the tribal court be allowed to address the question of whether it has jurisdiction first, before a federal court passes upon the question. See LaPlante, 480 U.S. at 15; National Farmer's Union, 471 U.S. at 857. Allowing the tribal court to decide in the first instance the factual and legal basis of the challenge to its jurisdiction promotes tribal self-government and self-determination. LaPlante, 480 U.S. at 15-16 (citing National Farmer's Union, 471 U.S. at 856-57). "At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." LaPlante, 480 U.S. at 17.

Mr. Lopez does not cite to either of the Montana exceptions. In addition, he does not acknowledge the need for exhaustion of tribal remedies under LaPlante or National Farmer's Union. Because of that substantive omission, Mr. Lopez does not argue that there is any exception to the requirement of

9

exhaustion of tribal remedies in his case.  In addition, neither party cites to any facts or documents that would indicate to this court that Mr. Lopez ever challenged the tribal court's jurisdiction over him in either the OST's trial court, or in the OST Supreme Court.  Instead, Mr. Lopez cites to various provisions of the OST statutory code in support of his argument that the tribal court lacked jurisdiction over him.

The Oglala Sioux Tribal Code contains a specific provision dealing with jurisdiction in matters involving the adoption of an Indian child.  The tribal code provides in this regard as follows:

> The Oglala Sioux Tribal Court shall have jurisdiction in any adoption proceeding involving an Indian child or adoptive Indian parent whose domicile or actual residence is within the exterior boundaries or upon trust land of the Pine Ridge Indian Reservation or who is a member of the Oglala Sioux Tribe and maintains sufficient contacts therewith, or which is brought under the jurisdiction of this Court by the Indian Child Welfare Act.

See OSTC Ch. 5, Subch. 8, § 8.01.  The OSTC also states that "[t]here shall be no adoption of Oglala Sioux Indian children by non-Indians."  See OST Juvenile Code, § 8.04.

Mr. Lopez argues that the Tribal Court did not have personal jurisdiction over him because he did not consent to that jurisdiction in writing, he was not an Indian, and J.R.L. was not an Indian.  Mr. Lopez's argument misses the mark on several fronts.  First of all, Mr. Lopez does not attempt to argue that Francine was not an "Indian."  The OSTC provides for jurisdiction over

10

adoptions where the parent "*or*" the child are Indian–the statute does not require that the child **and** both parents be "Indian."  See OSTC Ch. 5, Subch. 8, § 8.01.  Under the OSTC, an "Indian" is defined as "any person of Indian descent who is a member of any recognized Indian Tribe now under Federal jurisdiction."  See OSTC § 1.3.

The OSTC **does** prohibit the adoption of an Indian child by a non-Indian. Mr. Lopez argues that he is not an Indian since he is of Mexican descent. Therefore, argues Mr. Lopez, his adoption of J.R.L. was void under the OST Code.  However, this ignores the fact that Francine was presumably an Indian–a fact Mr. Lopez never argues to the contrary.  Accordingly, at least one of J.R.L.'s adoptive parents was an Indian and could adopt J.R.L. under the OSTC.  Mr. Lopez never points to any law indicating that adoption is prohibited when the adoptive parents are of mixed racial heritage.

Mr. Lopez is the party moving to dismiss the indictment against him.  It is Mr. Lopez's burden to show that the underlying Tribal Court adoption order was void for lack of personal jurisdiction.  Bigford, 365 F.3d at 872 (stating that "[t]he defendant in a [failure to pay child support] prosecution will bear the burden to prove a lack of personal jurisdiction in the underlying state support proceeding.").  He has failed to definitively show that.  First, the court notes that there may be tribal jurisdiction over Mr. Lopez under the first Montana exception because he entered into a consensual contract–the adoption

11

agreement–with a tribal member.  Plains Commerce Bank, 554 U.S. at 329.  Second, Mr. Lopez has failed to show that the provisions of the OST Code preclude the exercise of jurisdiction over him.

In any event, whether the Montana exceptions or the OST Code is the source of law either providing or prohibiting the tribal court's authority over Mr. Lopez, the law is clear that Mr. Lopez is required to first raise the challenge to the tribal court's jurisdiction in tribal court and allow the OST courts to determine their own jurisdiction first.  LaPlante, 480 U.S. at 15-18; National Farmer's Union, 471 U.S. at 856-57.  Only after a full and fair opportunity is given to the tribal courts to determine this issue can this court address the issue.  LaPlante, 480 U.S. at 15-18; National Farmer's Union, 471 U.S. at 856-57.

**C.    Whether the State Court Order is Valid and Thereby Prevents Any Collateral Attack on the Tribal Court Order**

Despite the anomalies in the state court proceedings, Mr. Lopez states that he "does not challenge the state order."  See Docket 46, page 6.  His sole argument regarding the state court order is that it is invalid because it relies upon the underlying tribal court order, which he asserts is invalid because the tribal court lacked personal jurisdiction over him.  Mr. Lopez asserts that "[s]ince the underlying adoption decree is invalid, all subsequent judgments and orders that follow are also necessarily invalid."  Id.  Mr. Lopez does not, however, cite to any case that stands for that proposition.

12

The government similarly asserts that "any ills in the tribal court order were cured by the state court proceedings." However, the government, too, fails to cite any case that stands for that proposition.

"A void judgment, as opposed to an erroneous one, is one which from its inception was legally ineffective." Kansas City Southern Ry. Co. v. Great Lakes Carbon Corp., 624 F.2d 822, 825 (8th Cir. 1980) (citing Williams v. North Carolina, 325 U.S. 226 (1945)). A void judgment is no judgment at all. Id. A "plaintiff may attack [a] judgment for lack of jurisdiction over the person at any time since a judgment rendered without jurisdiction over the person would be void." Taft v. Donellan Jerome, Inc., 407 F.2d 807, 808 (7th Cir. 1969). A void judgment cannot acquire validity due to laches. 11 J. Moore, Moore's Federal Practice ¶ 2862 (1973). The government cites to no authority whatsoever in support of the proposition that a state court judgment built upon a void tribal order or judgment can thereby insulate the tribal order from collateral attack.

Nevertheless, the court leaves for resolution on another day the issue of the effect of the intervening state court order and judgment on the tribal court order. It must first be determined whether the tribal court lacked personal jurisdiction over Mr. Lopez, and that determination must be made in the first instance by the OST Tribal Courts.

## CONCLUSION

The court respectfully recommends that defendant Francisco Lopez's motion to dismiss [Docket No. 28] be denied. The burden is on Mr. Lopez to

demonstrate that the tribal court lacked personal jurisdiction over him. Mr. Lopez has failed to establish this. He has also failed to exhaust his tribal remedies in tribal court and has not provided any law or argument establishing that an exception to the exhaustion requirement applies in his case.

### NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require ***de novo*** review by the district court. SeeThompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated July 10, 2012.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

14